# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GARY CULLEN | * |
| | * |
| v. | * Civil Action No. WMN-10-0055 |
| | * |
| SOMERSET COUNTY et al. | * |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM

Before the Court is a Motion for Summary Judgment filed by Defendants Somerset County and James Henderson. ECF No. 25. The motion is ripe. Upon a review of the parties' filings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion will be granted in part and denied in part.

## I. BACKGROUND

Plaintiff filed this action against: Somerset County; James Henderson, the former warden of the Somerset County Detention Center (SCDC); and Gary Maynard, in his official capacity as the Secretary of the Maryland Department of Public Safety and Correctional Services. In response to motions filed by all Defendants, the Court dismissed all claims against Secretary Maynard. The Court also dismissed several of the claims brought against the remaining Defendants and, as explained below, also circumscribed the potentially relevant time frame of the

remaining claims.  The claims that remain after the ruling on the previous motions and as further defined in the briefing of the current motion are as follows: (1) a claim brought against Defendant Henderson under 42 U.S.C. § 1983 for violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment arising from Plaintiff's incarceration in SCDC from November 15, 2006, to January 10, 2007 (Count I); (2) claims brought against Defendant Henderson and Somerset County for the violation of that same right under Article 25 of the Maryland Declaration of Rights (Count II); and (3) a claim of battery against Defendant Henderson arising out of the frisking of Plaintiff by Henderson conducted sometime in December of 2006 (Count V).

Before discussing the relevant facts contained in the record now before the Court, the Court notes that, while Defendants supported their motion and reply memoranda with exhibits and deposition testimony, Plaintiff submitted nothing in support of his opposition.  It appears that he is attempting to rely merely on the allegations in the Complaint.  See Opp'n at 1 (prefacing his statement of facts with "[a]s detailed in his seven-count Complaint" and "[f]or the sake of brevity, Plaintiff refers to the detailed-allegations contained in his Complaint").  Of course, at this stage of the litigation, Plaintiff cannot simply rely on unsubstantiated allegations in

the Complaint but must produce, by affidavit or other means, admissible evidence that supports those allegations. Evans v. Wilkinson, 609 F. Supp. 2d 489, 497 (D. Md. 2009); Fed. R. Civ. P. 56(e). Because Plaintiff has not done so, the factual background that follows is derived solely from the materials submitted by Defendants.

Plaintiff has been incarcerated in SCDC on more than one occasion. The Court in its previous memorandum, however, determined that any claim based upon conduct that occurred prior to his November 15, 2006, through January 10, 2007, incarceration was barred by the Local Government Tort Claim Act. The conduct of which Plaintiff complains during this November 2006 to January 2007 incarceration relates to an ongoing course of conduct that he asserts extended throughout much of this period of incarceration as well as to two discrete incidents described below.

The ongoing course of conduct consisted of threats made to Plaintiff by one of the correctional officers at SCDC, Sam Insley. Plaintiff testified that at least twice a week, from November 15, 2006, until December 30, 2006,[1] Insley would

---

[1] These are the dates provided in Plaintiff's Complaint for this course of conduct. Compl. ¶ 18. When asked in his deposition when Insley last made a threat, Plaintiff answered "[t]he first week of January . . . three or four days prior" to his transfer to the Wicomico County Detention Center on January 10, 2007. Pl.'s Dep. at 30.

3

"threaten to take Plaintiff out back and hang him." Pl.'s Dep. at 28. Plaintiff also states that Insley "proceeded on many occasions to emulate a noose being tightened around the Plaintiff's neck." Id. Although Plaintiff alleged in his Complaint that Defendant Henderson made threats of violence against him and made a gesture of a noose when speaking about Plaintiff, Compl. ¶¶ 18-19, in his deposition, Plaintiff testified that Insley issued the threats and made the gestures and that Henderson was never present when Insley did so. Pl.'s Dep. at 29.

The first discrete incident, the frisking of Plaintiff by Defendant Henderson, occurred on an unspecified date in December 2006. In his deposition, Plaintiff gave this account:

> I was walking back to the cellblock where I was housed from the visiting room. Henderson and two correctional officers, King and Mike Bivens, were walking towards me as if they were coming from the cellblock I was heading to. Warden Henderson told me to stop and get against the wall, which the wall was glass. I did this, and he started I believe on my right ankle and he came up like he was frisking me. And when he got closer to my private area he went up in a rough motion to hit me in my genitals.
>
> And this -- I said something to him like, "Watch out." And then he just said something like, "Shut up," or, "Do as you're told." He went to the next leg and continuously did the same, same motion.

Pl.'s Dep. at 26.

The second incident occurred on January 9, 2007. Defendant Henderson testified that, the day before this incident, he had received information that Plaintiff was orchestrating a plan to bring fentanyl, a narcotic similar to heroin, into the facility. The next day, Henderson ordered a lock down and had the facility searched and, while no fentanyl was found, some marijuana and other contraband were. Henderson testified that, while the facility was still on lock down, one of his subordinates, Sergeant Parkinson, came to him and said that Plaintiff was kicking on the door wanting a phone call.

Henderson's response forms the basis for Plaintiff's Eighth Amendment claim. According to a statement provided by Sergeant Parkinson, Henderson instructed Parkinson to go down to Plaintiff's cell block and have the television and phones turned on and let Plaintiff out of his cell. Parkinson was also instructed to tell Plaintiff "that this was his reward for the information that he had given the warden." Defs.' Ex C, Matter of Record, signed by Parkinson on January 9, 2007. Parkinson carried out those instructions and let Plaintiff out of his cell. After doing so he responded to Plaintiff, loud enough that other inmates could hear, "the warden said thanks for the information." Pl.'s Dep. at 33. Plaintiff casts this incident as Henderson's deliberate attempt to have Plaintiff "pegged as a

snitch." Plaintiff reports that, after hearing Parkinson's expression of the warden's thanks, the other inmates cussed at him through the doors, calling him a cop and a snitch.

For reasons not entirely clear from the record, Plaintiff was transferred the very next morning to the Wicomico County Detention Center (WCDC). There, he participated in a Residential Substance Abuse Treatment Program (RSAT Program). On February 26, 2007, Plaintiff was interviewed in connection with an investigation of Defendant Henderson and alleged abuses at the SCDC. The next day, Plaintiff was removed from the RSAT Program and he opines that his removal was retribution by Henderson for Plaintiff's participation in the investigation.

When Plaintiff was removed from the RSAT Program, he was transferred to another part of WCDC. Immediately after the transfer, he was attacked by several other inmates. Plaintiff attributes the assault to Henderson having had him labeled a snitch. Plaintiff alleges in his Complaint, but offers nothing to support the allegation, that as a result of his removal from the RSAT Program, he had to serve an additional two years in prison. See Compl. ¶ 41.

## II. LEGAL STANDARD

Rule 56(a) & (c) of the Federal Rules of Civil Procedures provides in relevant part:

> A party may move for summary judgment,
> identifying each claim or defense or the
> part of each claim or defense - on which
> summary judgment is sought. The court shall
> grant summary judgment if the movant shows
> that there is no genuine dispute as to any
> material fact and the movant is entitled to
> judgment as a matter of law. The court
> should state on the record the reasons for
> granting or denying the motion.
>
> A party asserting that a fact cannot be or
> is genuinely disputed must support the
> assertion by: (A) citing to particular parts
> of materials in the record, including
> depositions, documents, electronically
> stored information, affidavits or
> declarations, stipulations (including those
> made for purposes of the motion only),
> admissions, interrogatory answers, or other
> materials; or (B) showing that the materials
> cited do not establish the absence or
> presence of a genuine dispute, or that an
> adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(a) & (c).

The Supreme Court's standard does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of

material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As stated above, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

In conducting the aforementioned analysis, a court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 376-77 (2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Id. at 380.

## III. DISCUSSION

### A. Statute of Limitations

Because § 1983 provides no limitations period for actions brought thereunder, courts "borrow" the limitations period for the most analogous state action. Grattan v. Burnett, 710 F.2d 160, 162 (4th Cir. 1983). For § 1983 claims, the applicable

8

limitations period is borrowed from Maryland's general statute of limitations which provides for a three year limitations period. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Plaintiff's Maryland Declaration of Rights claim is also subject to the same limitations period, Davidson v. Koerber, 454 F. Supp. 1256, 1260 (D. Md. 1978), as is his battery claim. Ford v. Douglas, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002).

This action was filed on January 8, 2010. Accordingly, absent the applicability of some rule or theory that would allow Plaintiff to reach back beyond January 8, 2007, he cannot base any of his claims on either the December 2006 frisking incident, or Insley's threats that ended in December 2006. Plaintiff attempts to extend the scope of his claims through application of the "continuous tort" theory. Under this theory, when tortious conduct is of a continuing nature, the statute of limitations generally runs from the date of the last tortious act or until the tortious conduct ceases. Gross v. United States, 676 F.2d 295 (8th Cir. 1982); Williams v. Norfolk and W. Ry Co., 530 F.2d 539, 542 (4th Cir. 1975); see also Shamsud'diyn v. United States, Civ. No. 00-1893, 2001 WL 436152 at *2 (D. Md. Apr. 6, 2001) ("'When a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases,'" quoting Page v. United States, 729 F.2d 818, 821-22 (D.C. Cir. 1984)). Because

9

the "pegged-as-a-snitch" incident is within limitations, Plaintiff argues that, under the continuing tort theory, his claims can reach back to encompass the earlier conduct as well. In ruling on the motion to dismiss, the Court left open the possibility that "at [that] stage in the litigation," ECF No. 14 at 10, and based on the allegations in the Complaint, the theory might apply.

Looking now at the record before the Court and not just Plaintiff's allegations, the Court finds that the conduct about which Plaintiff complains is not sufficiently continuous in nature so as to allow Plaintiff to reach back into 2006 to support his claims. The continuing tort doctrine applies where "no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm." Page, 729 F.2d at 821-22 (internal quotation omitted). "A violation is called 'continuing' . . . when it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct." Heard v. Sheahan, 253 F.3d 316, 319 (7th Cir. 2001). For example, a hostile work environment claim under Title VII alleges a continuing violation because, unlike a discrete act of discrimination, it is based on "repeated conduct . . . [that] cannot be said to occur on any particular day." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).

Here, the only conduct besides the pegged-as-a-snitch incident that can be attributed to Henderson - the frisking incident - was clearly a discrete act. It is also distinct from the rest of the conduct of which Plaintiff complains in that it involved a physical affront. Furthermore, Insley's threats cannot be viewed as part of any continuing chain of events in that Plaintiff has offered nothing to tie that conduct in any way to Defendant Henderson. The Complaint alleged that "[d]uring the time period from November 15, 2006 until December 30, 2006, Defendant Henderson, Officer Insley and other agents, servants and employees of the Somerset County Detention Center made threats of violence toward Plaintiff Cullen, including statements that the Plaintiff would be hanged during the night." Compl. ¶ 18 (emphasis added). In his deposition, however, Plaintiff only offered testimony about Insley making these threats. Pl.'s Dep. at 28. Plaintiff acknowledged that Henderson was never present when Insley made these threats and, in response to counsel's question as to why Plaintiff believed Insley's threats were made at Henderson's request, he answered that Insley said that Henderson was coming to hang him and "I don't see why the correctional officer would just say that if it wasn't the truth." Id. at 29.

Because the Court finds the continuing tort theory inapplicable based upon the record now before it, the Court

11

holds that Plaintiff cannot premise his claims on conduct that occurred prior to January 8, 2007. Accordingly, Plaintiff's battery claim will be dismissed and his § 1983 and Maryland Declaration of Rights claims will be limited to the pegged-as-a-snitch incident and its repercussions.

   B. Eighth Amendment Claim

It is well established that the Eighth Amendment obligates prison officials to take reasonable precautions to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). While harsh prison conditions can be part of the penalty prisoners must pay, subjecting a prisoner to harm from other prisoners is not part of the prisoner's punishment. Id. at 833. Indeed, it is considered cruel and unusual punishment, for "gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penalogical objective, any more than it squares with evolving standards of decency." Id. Thus, prison officials must take "reasonable measures to guarantee the safety of the inmates themselves." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

To establish an Eighth Amendment claim under Farmer, a plaintiff must satisfy two elements: (1) that the plaintiff was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendant was deliberately

indifferent to those conditions, i.e., defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. The first prong is objective and requires a plaintiff to prove that a defendant's action or inaction resulted in or created a sufficient risk of harm. Id. The second prong is subjective and requires a plaintiff to prove that a defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that defendant drew] the inference." Id. at 837.

Where prison officials or personnel have intentionally caused inmates to be identified as informants or snitches, courts have consistently found Eighth Amendment violations. See e.g., Benefield v. McDowall, 241 F.3d 1267 (10th Cir. 2001); Northington v. Marin, 102 F.3d 1564, 1567-68 (10th Cir. 1996); Hobbs v. Evans, 924 F.2d 774, 775 (8th Cir. 1991); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989); Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984); Gullate v. Potts, 654 F.2d 1007, 1012 (5th Cir. 1981). The reasoning of these holdings is obvious. As to the first Farmer prong, courts readily recognize that the reputation as a snitch places an inmate at "substantial risk of injury" at the hands of other inmates. Reese v. Groose, 60 F.3d 487, 488 (8th Cir. 1995). As the Fourth Circuit has noted, "[i]t is impossible to minimize the possible consequences to a prisoner of being labeled a

'snitch.'" Miller v. Leathers, 913 F.2d 1085, 1088 n* (4th Cir. 1990). As to the second prong, where the prison official has intentionally caused the plaintiff to be identified as an informant, there is no difficulty in finding a sufficiently culpable state of mind.

Defendant Henderson argues that, even if he did violate Plaintiff's right to be free from cruel and unusual punishment, he is nevertheless entitled to qualified immunity. Government officials sued under § 1983 have the benefit of qualified immunity when their performance of discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit, not merely a defense to liability. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

In Saucier v. Katz, the Supreme Court set out a two-step inquiry for lower courts to use to determine whether the defense applies. 533 U.S. 194, 201-02 (2001). First, a court must determine whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's conduct violated a constitutional right." Id. at 201. If a constitutional violation did occur, the court then asks "whether the right was clearly established." Id. at 202. In making this second inquiry, the court "ascertains

'whether a reasonable [official] could have believed [the challenged conduct] to be lawful, in light of clearly established law.'" Meeker v. Edmundson, 415 F.3d 317, 323 (4th Cir. 2005) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). The Supreme Court has since held that the sequence of inquiry required by Saucier is no longer mandatory. Pearson v. Callahan, 555 U.S. 223, ---, 129 S. Ct. 808, 818 (2009).

As discussed above, the Court finds that, drawing all inferences in Plaintiff's favor, it is possible that he could demonstrate that Henderson's conduct violated a constitutional right. As to the second Saucier prong, Defendants acknowledge that courts in other federal circuits have imposed liability on prison officials who expose inmates to violence by labeling them snitches. Mot. at 36-37. They argue, however, that the constitutional right was not clearly established because "no case in this Federal Circuit or in this District has ever held that a prison official is exposed to constitutional liability for a statement thanking an inmate for information, with no proximately caused injury." Id. at 37. In determining whether a constitutional right is clearly established, however, courts must avoid defining the right so narrowly, in a manner which is so dependent upon the facts of a particular case, that qualified immunity is virtually guaranteed. "Of course, 'this is not to say that an official action is protected by qualified immunity

15

unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" Gooden v. Howard County, Md., 954 F.2d 960, 968 (4th Cir. 1992) (quoting Anderson v. Creighton, 483 U.S. at 640).

At the time of the conduct in question, it was clearly established under Farmer and its progeny that prison officials had a duty to protect prisoners from the violent acts of other prisoners. The Fourth Circuit had recognized, and common sense and experience make evident, that identifying an inmate as an informer would place that inmate in harm's way. The inference could certainly be drawn that this is what Henderson intended when he instructed Parkinson to publically "thank him for the information." The Court concludes that Henderson is not entitled to summary judgment on the basis of qualified immunity.

While the Court finds that Plaintiff can go forward with his Eighth Amendment and Maryland Declaration of Rights claims,[2] there is a question as to what damages he might be able to recover. Plaintiff was transferred out of SCDC the very next day after he was labeled an informant and he was not assaulted

---

[2] The protections under Article 25 of the Maryland Declaration of Rights against cruel and unusual punishment are considered in pari materia with those of the Eighth Amendment of the United States Constitution. Evans v. State, 914 A.2d 25, 67 (Md. 2006).

while at SCDC. Plaintiff was assaulted a month and an half later while at the WCDC, but Plaintiff cannot recover in this action for any injury he may have sustained as a result of that assault. As Defendants noted in their motion, Plaintiff, in settling a separate suit filed against Wicomico County, executed a release of all claims against any person arising out of the assault at the WCDC. Plaintiff makes no argument to the contrary.[3]

While Plaintiff cannot recover for any physical injuries attendant to any assault, "the Eighth Amendment may be implicated not only to physical injury, but also by the infliction of psychological harm." Benefield, 241 F.3d at 1272 (citing Hudson v. McMillian, 503 U.S. 1, 16-17 (1992)). There was aperiod of time, albeit very brief, that Plaintiff feared for his life or safety while he remained a SCDC. This creates the potential for some minimal damages.

## IV. CONCLUSION

For the above stated reasons, Defendants' Motion for Summary Judgment will be granted as to Count V. The motion will be denied as to Counts I and II, but those claims are limited to

---

[3] In addition, Plaintiff has not offered any evidence to connect the WCDC assault to Defendant Henderson's conduct. In addition to the attenuated temporal connection, there is no evidence that inmates at WCDC were aware of Parkinson "thanking" Plaintiff at SCDC. Furthermore, Plaintiff was assaulted at WCDC shortly after he informed inmates there that he was participating with prison authorities in an investigation of SCDC.

17

the "pegged-as-a-snitch" incident of January 9, 2007. A separate order will issue.

/s/
William M. Nickerson
Senior United States District Judge

Dated: May 25, 2011.